MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:    2015 ME 35
Docket:      Sag-14-102
Argued:      December 10, 2014
Decided:     March 19, 2015

Panel:       SAUFLEY, C.J., and ALEXANDER, MEAD, GORMAN, JABAR, and HJELM, JJ.

## STATE OF MAINE

v.

## JAMES D. GRAHAM

JABAR, J.

[¶1]  James D. Graham appeals from a judgment of conviction of attempted kidnapping (Class B), 17-A M.R.S. §§ 152(1)(B), 301(1)(B)(2) (2014), and assault (Class D), 17-A M.R.S. § 207(1)(A) (2014), entered in the trial court (*Horton, J.*) after a bench trial.  Graham contends that the court erred in analyzing the defense of mental abnormality, *see* 17-A M.R.S. § 38 (2014), and that the evidence was insufficient to support his conviction.  We conclude that the court applied the correct analysis in determining whether evidence of a mental abnormality negated Graham's culpable state of mind, and that there was sufficient evidence presented at trial for the court to find him guilty beyond a reasonable doubt.  We therefore affirm Graham's conviction.

## I. FACTS

[¶2] Viewed in the light most favorable to the State, the evidence admitted at trial establishes the following facts. *See State v. Perkins*, 2014 ME 159, ¶ 2, 107 A.3d 636. On May 22, 2013, a woman drove to the Bowdoinham Park & Ride with her two-year-old grandson to meet her daughter, the child's mother. The grandmother arrived at the Park & Ride before the mother and backed into a parking space. When the mother arrived, she parked next to the grandmother.

[¶3] The mother was followed closely by an SUV, which parked on the other side of the grandmother's car. When the grandmother and the mother exited their vehicles, the driver of the SUV, James Graham, rolled down his window and tried to converse with them. The women had never seen the driver or his SUV before. Graham exited the SUV and approached the grandmother's car.

[¶4] The grandmother removed the child from her car and placed him in the space between her and the mother's cars. While the women talked, the child walked behind the grandmother, within the mother's line of sight. The grandmother observed a "terrible" look come over the mother's face, turned around, and saw Graham on his knees with his hands extended to the child.

[¶5] The grandmother picked up the child and put him on her hip. Graham then grabbed the child's forearm and said angrily, "I'm taking him home with me tonight." The grandmother responded, "No, you're not," and Graham repeated

himself. Maintaining his grip on the child, he said, "You don't understand. You have no choice. He's mine now. There's nothing you can do about it." Graham pulled forcefully on the child's forearm, but the grandmother gripped the child's bicep tightly, keeping him on her hip.

[¶6] As the grandmother struggled to maintain control of the child, she heard a car start. Graham turned to look at that car and released the child. The grandmother ran with the child across the parking lot. Graham yelled that the grandmother needed to repent and pray for forgiveness. The women told him that law enforcement officers were on their way. Graham retorted, "You're going to wish you didn't do that," then got into his SUV and drove away.

[¶7] After Graham's departure, the mother called 9-1-1, and, with the child in her car, left the Park & Ride followed by the grandmother. Approximately five minutes after leaving the Park & Ride, as the women were driving south on the interstate, they passed Graham's SUV, which was stopped in the breakdown lane. As they passed the SUV, it pulled onto the highway and followed the grandmother. The grandmother called 9-1-1 and was instructed to activate her hazard lights. Two Maine state troopers identified Graham's SUV and stopped it.

[¶8] When the troopers arrested Graham, he was initially calm and complied with the troopers' orders. After obtaining a warrant, one of the troopers

4

searched the SUV and found a loaded semiautomatic handgun, brass knuckles, knives, an axe, a machete, paracord, cable ties, straps, and duct tape.

[¶9]  Graham was indicted on one count of attempted kidnapping and one count of assault.  Following his arraignment, he underwent multiple psychological evaluations, one of which affirmed that he was competent to stand trial.  He rejected the State's plea offers, waived his right to a jury, and requested a bench trial.  *See* M.R. Crim. P. 23(a).[1]  At trial, Graham stated on the record that he had decided not to plead the affirmative defense of lack of criminal responsibility due to insanity.  *See* 17-A M.R.S. § 39 (2014).  However, the defense argued that, at the time of the Park & Ride incident, Graham had suffered from an abnormal condition of mind that raised a reasonable doubt as to his intent to kidnap the child. *See* 17-A M.R.S. § 38.

[¶10]  To show that he lacked the requisite intent, Graham presented the testimony of Dr. Magnuson, a psychologist who had evaluated him.  Dr. Magnuson testified that when she asked Graham about the Park & Ride incident, he told her that he had been concerned about the safety of a wandering child.  She opined that at the time of the incident, Graham had suffered a "psychotic break" caused by

---

[1]  The Maine Rules of Criminal Procedure have since been superseded in Sagadahoc County by the Maine Rules of Unified Criminal Procedure.  *See* M.R.U. Crim. P. 1(e)(1).

traumas that he experienced during his Air Force service[2] and stressors related to his parents' declining health. She testified that a "psychotic break" was not a normal state of mind because it resulted in distorted perceptions of reality. She also testified that someone suffering a "psychotic break" could develop and act on a plan, and that there was no evidence that Graham's "psychotic break" interfered with his ability to act in a planful, goal-directed way at the time of the incident.

[¶11]   The State's psychological expert, Dr. Wisch, corroborated Dr. Magnuson's testimony and opinion. He testified that when he interviewed Graham about the incident, Graham told him that he had seen a little boy and perceived him to be in danger. Dr. Wisch was also of the opinion that Graham was experiencing "psychiatric symptoms" at the time of the incident, which "did not interfere with his basic orientation and ability to engage in goal-directed, planful behavior."

[¶12]   At the close of the evidence, the court found that Graham had engaged in conduct that caused offensive physical contact to the child and, by grabbing the child's arm and saying that he intended to take him home, had engaged in conduct that constituted an attempt to restrain the child. It found that Graham was "operating under [an] impaired perception of reality at the time" of

---

[2] Graham entered the United States Air Force in 2002 and was honorably discharged in 2012. During this ten-year period, he was deployed on multiple combat and humanitarian tours in theaters including Afghanistan, Japan, and the Philippines.

the incident and that "there's no doubt that, that perception constitutes an abnormal condition of the mind." The court then considered whether the evidence of Graham's mental state at the time of the incident "raise[d] a reasonable doubt as to [his] intent to complete a knowing restraint of [the child], which is the key element of kidnapping."

[¶13] The court found that the child had not been at risk, and that although Graham claimed to have been acting for the child's benefit, he "did not act in a manner that would be consistent with a . . . bystander seeing a child who is in jeopardy." It found that Graham had engaged in "goal directed, volitional actions" during the incident as evidenced by his ability to operate his SUV and converse with the women, his decisions to wait on the side of the interstate for them to pass and to then follow them, and his calm interaction with the authorities when he was arrested. The court did "not find that Mr. Graham's apparent perception of reality raise[d] a reasonable doubt as to his intent to complete the offense of kidnapping."

[¶14] The court concluded that the State had proved beyond a reasonable doubt that Graham had the intent to complete a knowing restraint of the child, and convicted Graham of both attempted kidnapping and assault. It sentenced Graham to four years' imprisonment for the attempted kidnapping conviction, but suspended all but fifteen months of the sentence, and imposed three years of probation. The court also imposed a concurrent sentence of 364 days for the

assault conviction, along with the mandatory $300 fine. Graham appealed to us. *See* M.R. App. P. 2(b)(2)(A).

## II. DISCUSSION

A. Abnormal State of Mind

[¶15] We are asked to consider whether the trial court correctly analyzed Graham's mental abnormality defense when it concluded that he was guilty of attempted kidnapping. The trial court's application of a statutory defense is an issue of law that we review de novo. *See State v. Cannell*, 2007 ME 30, ¶ 6, 916 A.2d 231.

[¶16] Graham could be convicted of attempted kidnapping only if he knowingly took a substantial step toward restraining[3] the child with the intent to complete the commission of the crime. *See* 17-A M.R.S. §§ 152(1)(B), 301(1)(B)(2). The State bore the burden of proving these culpable mental states beyond a reasonable doubt. *See* 17-A M.R.S. § 32 (2014).

[¶17] At trial, Graham raised the defense of mental abnormality set out in 17-A M.R.S. § 38, which provides that "[e]vidence of an abnormal condition of the mind may raise a reasonable doubt as to the existence of a required culpable state of mind." When mental abnormality is put in issue, "the burden remains on the

---

[3] Title 17-A M.R.S. § 301(2)(B) (2014) defines "restrain" to include an act that "restrict[s] substantially the movements of another person without the other person's consent . . . by . . . [m]oving the other person a substantial distance from the vicinity where the other person is found."

8

prosecution to prove the culpable state of mind beyond a reasonable doubt." *State v. Likay*, 458 A.2d 427, 428 (Me. 1983).

[¶18]  The defense of mental abnormality set out in section 38 is distinct from the affirmative defense of insanity contained in 17-A M.R.S. § 39.  *See State v. Estes*, 418 A.2d 1108, 1117 (Me. 1980) (explaining the difference between the defense of mental abnormality, which was then codified at 17-A M.R.S.A. § 58 (1-A), and the defense of insanity, then codified at 17-A M.R.S.A. § 58(1)).

[¶19]  The insanity defense requires proof that the defendant suffered from a "mental disease or defect" that rendered the defendant unable to appreciate the wrongfulness of his or her conduct.  17-A M.R.S. § 39(1).  For purposes of the insanity defense, "mental disease or defect" is specifically defined as a "severely abnormal mental condition[] that grossly and demonstrably impair[s]" the defendant's "perception or understanding of reality."  *Id.* § 39(2).  The insanity defense is an affirmative defense, *see id.* § 39(3), which the defendant must prove by a preponderance of the evidence, *see* 17-A M.R.S. § 101(2) (2014).  If the fact-finder determines that a defendant has a mental disease or defect "of a specific character—that which substantially affects cognitive or substantially impairs volitional processes"—that defendant may be found "not guilty by reason of insanity."  *See Estes*, 418 A.2d at 1117.

[¶20]  In contrast, the mental abnormality defense, which was presented in this case, requires sufficient evidence that the defendant suffered from an abnormal condition of the mind that "raises a reasonable doubt as to whether the defendant possessed the requisite culpable mental state for the particular offense charged." *Id.*  For purposes of the mental abnormality defense, the abnormality need not possess a specific character.  *Id.*; *see* 17-A M.R.S. § 38.  The defense does not relieve the defendant of criminal responsibility, but rather "raises the question whether the State has proven beyond a reasonable doubt that the defendant committed the crime at all." *Estes*, 418 A.2d at 1117.

[¶21]  The mental abnormality defense is relevant to the question of the defendant's guilt when a culpable state of mind is an element of the crime charged because the defense "tend[s] to negate the conclusion that [the] defendant had a culpable state of mind." *State v. Murphy*, 496 A.2d 623, 630-31 (Me. 1985) (emphasis omitted); *see also State v. Valentine*, 443 A.2d 573, 576 (Me. 1982).  By contrast, the insanity defense is not relevant to whether the defendant committed the crime as alleged because it "does not negate the existence of a culpable mental state; rather it serves as an excuse." *See State v. Ellingwood*, 409 A.2d 641, 646 (Me. 1979).

[¶22]  A defendant may raise both the defense of insanity and the defense of mental abnormality.  *See, e.g., State v. Burnham*, 427 A.2d 969, 970 (Me. 1981).

Because Graham did not raise the insanity defense, the trial court was not required to consider whether evidence that Graham suffered from a distorted perception of reality rendered him not criminally responsible for his actions. The court's inquiry was framed by the mental abnormality defense that Graham raised. This defense required the court to consider whether the evidence of Graham's mental abnormality created a reasonable doubt as to the State's allegation that he acted with the intent to kidnap the child.

[¶23] "[E]vidence that a defendant may have been suffering from mental or emotional difficulties does not necessarily suggest that defendant's conduct was not intentional [as that term is] defined in the criminal code." *State v. Mishne*, 427 A.2d 450, 454 (Me. 1981). Pursuant to 17-A M.R.S. § 35(1)(A) (2014), "[a] person acts intentionally with respect to a result of the person's conduct when it is the person's conscious object to cause such a result." The statutory definition of intentional conduct focuses on the purposeful nature of the conduct and the actor's awareness of its consequences. Thus, in evaluating whether evidence of the defendant's abnormal mental state raises doubt as to the intentional quality of the defendant's actions, the fact-finder should consider the relationship between the defendant's mental state and evidence that the defendant in fact acted purposefully and appreciated the consequences of his or her actions. *See State v. Abbott*,

622 A.2d 723, 725-26 (Me. 1993); *State v. Leblanc*, 559 A.2d 349, 351 (Me. 1989).

[¶24]  Here, the court properly considered the defense of mental abnormality in determining guilt or innocence.  Contrary to Graham's contentions, the court did not shift the burden of proof to him or apply an incorrect analysis by considering his reasonableness at the time of the incident.

[¶25]  The court's references to the reasonableness of Graham's perceptions and actions at the Park & Ride echoed the reasoning underlying Dr. Magnuson's opinion that Graham was suffering from psychosis at the time of the incident. Evidence of Graham's distorted perception that the child was in danger also tended to confirm the court's finding that Graham acted with the conscious object of removing the child from danger by taking him home.  *See Mishne*, 427 A.2d at 455 ("In fact, evidence of a compelling need tends to confirm the conclusion that defendant acted with awareness and with the conscious object of fulfilling that need.").  The reasonableness of Graham's perceptions and actions was relevant to whether Graham suffered from a distorted perception of reality at the time of the incident and whether he acted with the requisite intent notwithstanding that perception.  In referring to Graham's reasonableness, the court was not requiring Graham to prove the elements of a justification defense; it was instead referring to

the facts that supported its finding that Graham was suffering from an abnormal condition of mind and that he acted intentionally despite that condition.

[¶26] After considering the reasonableness of Graham's actions and perceptions, the court looked to other facts that supported its finding that the State had proved beyond a reasonable doubt that Graham engaged in volitional, goal-oriented behavior at the time of the incident. The court applied the correct standard in determining whether Graham possessed the requisite intent to commit the crime of attempted kidnapping. In so doing, the court properly placed the burden on the State to prove all elements of the offense beyond a reasonable doubt.

B.     Sufficiency of the Evidence

[¶27] Graham argues that, in view of the evidence that he suffered from an abnormal condition of mind at the time of the incident, the evidence was insufficient to justify a finding beyond a reasonable doubt that he acted with the intent to restrain the child by moving him a substantial distance.[4] "When reviewing the sufficiency of the evidence, we view the evidence in the light most favorable to the State to determine whether the trier of fact rationally could have found beyond a reasonable doubt every element of the offense charged."

---

[4] *See* 17-A M.R.S. § 152(1)(B) (2014) (defining criminal attempt to require that the defendant act with the kind of culpability required for the commission of the crime, and with the intent to complete the crime's commission); *id.* § 301(1)(B) (defining the crime of kidnapping as the defendant's knowing restraint of another person); *id.* § 301(2) (defining restraint to include the defendant's act of "restrict[ing] substantially the movements of another person without the other person's consent," by "[m]oving the other person a substantial distance").

*State v. Gallant*, 2004 ME 67, ¶ 2, 847 A.2d 413 (quotation marks omitted). We will vacate a conviction for insufficiency of the evidence only if the fact-finder could not rationally have been convinced of the defendant's guilt beyond a reasonable doubt. *State v. Logan*, 2014 ME 92, ¶ 17, 97 A.3d 121.

[¶28] The weight given to the evidence and the determination of witness credibility are matters within the fact-finder's exclusive province. *Id.* Evidence that the defendant suffered from an abnormal condition of the mind at the time of the commission of the criminal act permits the fact-finder to entertain a reasonable doubt as to the defendant's intent, but does not compel such doubt. *Gallant*, 2004 ME 67, ¶ 4, 847 A.2d 413. In considering whether the defendant had the requisite intent when the criminal act was committed, the fact-finder may look to the act itself, the attendant circumstances, and any other evidence tending to prove the defendant's mental state. *Estes*, 418 A.2d at 1113.

[¶29] Here, the court's finding that Graham acted with the intent to move the child a substantial distance was supported by evidence of Graham's actions and statements during the incident, and by the opinion, shared by Dr. Magnuson and Dr. Wisch, that Graham was capable of engaging in planful, goal-oriented behavior at the time of the incident. Graham was aware that he was interacting with the child at the Park & Ride, and his threats to take the child home with him support the conclusion that it was his conscious object to take the child to his home in

New Hampshire. *See State v. Sommer*, 409 A.2d 666, 669 (Me. 1979) ("Although particular statements made by defendant had a ring of irrationality . . . the threat uttered by defendant made plain his awareness."). Graham's decisions to wait on the side of the highway after leaving the Park & Ride and to then follow the women after they passed him also support the court's finding that he was acting in a purposeful manner at the time of the incident.

[¶30] Viewing the evidence in the light most favorable to the State, we conclude that the evidence warranted the court's finding beyond a reasonable doubt that Graham acted with the intent to complete the crime of attempted kidnapping. *See State v. Huff*, 469 A.2d 1251, 1254 (Me. 1984).

The entry is:

Judgment affirmed.

**On the briefs:**

James T. Lawley, Esq., Lipman & Katz, P.A., Augusta, for appellant James D. Graham

Geoffrey A. Rushlau, District Attorney, and Patricia A. Mador, Asst. Dist. Atty., Office of the District Attorney, Bath, for appellee State of Maine

**At oral argument:**

James T. Lawley, Esq., for appellant James D. Graham

Patricia A. Mador, Asst. Dist. Atty., for appellee State of Maine

Sagadahoc County Superior Court docket number CR-2013-106
For Clerk Reference Only